
Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5808 | **DATE** | 4/26/2004 |
| **CASE TITLE** | Dowe vs. National Railroad | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons set forth on the attached Memorandum Opinion and Order, Amtrak's motion in limine (92-1) is granted in part and denied in part as to request 1, 2 and 3; plaintiffs' 5/3/04 pretrial motion in limine (95-1) is granted as to request 1, deferred as to requests 2 and 5, granted in part and denied in part as to request 3, and denied as to request 4; and Birmingham Steel's motion in limine is granted as to requests 1,4,5,6,7, granted in part as to request 9, and denied as to requests 2,3, and 8.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | **Document Number** | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | APR 2 9 2004 | | |
| | Notified counsel by telephone. | | date docketed | 111 | |
| | Docketing to mail notices. | | GMA | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | U.S. DISTRICT COURT | date mailed notice | | |
| OR | courtroom deputy's initials | | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA DOWE, Independent Administrator of the Estate of Sheena Dowe, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 01 C 5808 |
| NATIONAL RAILROAD PASSENGER CORP., d/b/a Amtrak, | ) ) ) | |
| Defendant. | ) ) | |

**DOCKETE**

**APR 2 9 20**

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On March 15, 1999, an Amtrak passenger train collided with a truck at a railroad crossing at Bourbonnais, Illinois, resulting in the loss of many passengers' lives and injuries to a number of others. The plaintiffs in this case are some sixty persons who have sued Amtrak, which in turn has filed third party claims for contribution against several other persons and entities. An exemplar trial concerning the claims of several of the plaintiffs is set for May 3, 2004. In this Memorandum Opinion and Order, the Court rules on the parties' motions *in limine.* As the Court previously advised the parties, the rulings on these motions govern all of the claims pending before the Court, not just those particular claims that will be tried on May 3.

A.    **Amtrak's motions**

1.    **Expert testimony regarding "reasonableness," "prudence" and the standard of care**

Amtrak seeks to preclude plaintiffs' liability experts Richard Beall (a former railroad

engineer) and William Berg (a consulting engineer) from testifying regarding the "reasonableness" or "prudence" of the conduct of Amtrak's engineer and perhaps others, and also from characterizing the duty of care owed by Amtrak to the plaintiffs. An expert cannot testify about legal issues on which the court will instruct the jury. *E.g., United States v. Sinclair,* 74 F.3d 737, 757 n.1 (7th Cir. 1996). For this reason, it would be improper for Beall or Berg to characterize Amtrak's duty of care, as Beall did in his report, as "the highest duty of care."

Plaintiffs' experts may, however, identify the standard of care upon which their opinions are based, subject to the Court's control if they state this erroneously or inadequately. The Court also rejects Amtrak's argument that the witnesses should be barred from identifying certain actions as unreasonable or imprudent. Under Federal Rule of Evidence 704(a), "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact" (with certain exceptions not applicable in this case). Though a bare conclusion that particular conduct is "reasonable" or "unreasonable" likely would not be particularly helpful to the jury, and thus potentially inadmissible under Federal Rule of Evidence 702, based on the written reports of plaintiffs' experts the Court has no reason to believe that counsel intends to elicit bare conclusions. With explanation, testimony regarding the reasonableness or unreasonableness of particular conduct will assist the jury in understanding the evidence and determining facts in issue, and will not simply "tell the jury what result to reach." *See* Fed. R. Evid. 704, Advisory Comm. Notes. Moreover, an instruction to the jury that it is not required to accept an opinion witness's conclusions – part of the standard instructions this Court routinely gives – will suffice to eliminate any potential unfair prejudice to the opposing party. Finally, unlike in *Isom v. Howmedica, Inc.,* No. 00 C 5872, 2002 WL 1052030

2

(N.D. Ill. May 22, 2002), a case in which this Court precluded expert testimony on various points, there is no indication that the plaintiffs' experts intend to opine regarding Amtrak's state of mind, or that the experts have nothing to contribute on the issue in question that goes beyond the knowledge possessed by an ordinary juror. *Accord, United States v. Barile*, 298 F.3d 749, 761 (4th Cir. 2002) (trial court erred in precluding expert from testifying that submissions to government agency were "not unreasonable").

## 2. Preemption of claims concerning training and operating standards

The Federal Railroad Safety Act of 1970, 45 U.S.C. §§ 421-457, was enacted "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons ...." *Id.* § 421. To this end, the FRSA empowers the Secretary of Transportation to prescribe appropriate rules, regulations and standards for all areas of railroad safety. *Id.* § 431(a). States are permitted to adopt or continue in force their own standards relating to railroad safety "until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement." *Id.* § 434(a). In addition, a State may adopt a safety requirement more stringent than an established federal standard "when necessary to eliminate or reduce an essentially local safety hazard," if the State's requirement is "not incompatible with" federal regulations and is not an undue burden on interstate commerce. *Id. See generally CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658 (1993).

Amtrak seeks to preclude the plaintiffs from presenting evidence or argument that Amtrak's engineer was inadequately trained or instructed. Among other things, plaintiffs' expert Beall proposes to offer opinion testimony that "Amtrak failed to properly train and provide

3

appropriate and safe procedures to its engineers ... as to what options should be taken" if an obstruction appears on a crossing of the railroad tracks in front of the engineer. Beall Report, pp. 3-4. The parties appear to agree that Beall's opinion is premised on a purported duty of care arising from state law. Amtrak argues that because the Federal Railway Administration (part of the Department of Transportation) has established regulations regarding the qualification and certification of locomotive engineers, any state law-based standard is preempted.

The plaintiffs ask the Court to reject Amtrak's argument summarily because it amounts to an untimely motion for summary judgment. The Court disagrees. A motion *in limine* is, generally speaking, an appropriate mechanism for determining the proper scope of evidence and argument at trial. We have no indication that a ruling favorable to Amtrak would be dispositive of the plaintiffs' claim, and in any event expert discovery in this case largely came after the deadline for filing dispositive motions.

The plaintiffs do not contend that purported state-law duty of care on which they rely is permissible under § 434(a)'s exception for standards "necessary to eliminate or reduce an essentially local safety hazard"; rather they argue that the FRA has not adopted regulations "covering the subject matter" of the state-law duty. In determining whether a federal standard regarding railroad safety preempts state law, it is not enough that the federal regulation "touch upon" or "relate to" the same subject matter as the state law standard; preemption exists "only if the federal regulations substantially subsume the subject matter of the relevant state law." *Easterwood,* 507 U.S. at 664-65. To make this determination, the Court must examine not just the particular federal regulation at issue, but also "related safety regulations" and "the context of the overall structure of the regulations." *Id.* at 674.

4

A state can "fill gaps where the Secretary [of Transportation] has not yet regulated." *Burlington Northern & Santa Fe Ry. v. Doyle,* 186 F.3d 790, 795 (7th Cir. 1999). The "important thing" for purposes of determining preemption "is that the FRA considered a subject matter and made a decision regarding it." *Id.* The "subject matter" of the state requirement for purposes of § 434(a) is "the safety concerns that the state law addresses." *Id.* at 796. "[D]etermining the safety concerns that a state or federal requirement is aimed at will necessarily involve some level of generalization that requires backing away somewhat from the specific provisions at issue. ... Otherwise a state law could be preempted only if there were an identical federal regulation, and ... *Easterwood* teaches that this is not so." *Id.* (citing *Easterwood,* 507 U.S. at 674). But "with too much generalizing – 'public safety' or 'rail safety' – our analysis would be meaningless because all FRA regulations cover those concerns." *Id.*

In *Doyle,* the Seventh Circuit held that a Wisconsin statute that required trains to be operated by at least one person who had been certified under federal regulation as a train service engineer, locomotive servicing engineer, or student engineer, plus one person who had successfully completed a railroad carrier's training program and passed an examination on its operating rules, was preempted. The court noted that FRA regulations established detailed requirements for the qualification of engineers and thus covered the same subject matter as Wisconsin's requirements – ensuring that a train or locomotive crew can operate a train safely. It therefore held that Wisconsin's certification requirements were preempted. *Id.* at 796-97. The court reached the same conclusion regarding the two-person crew requirement, as applied to certain types of railroad operations that the FRA was shown to have considered. *Id.* at 797-802. It found, however, that the two-person crew requirement was not preempted as to over-the-road

operations, as there was no indication that the FRA had ever considered that issue (except to the extent that the FRA had specifically agreed with the Wisconsin Central Railroad that it could use one-person crews for over-the-road operations). *Id.* at 802-04.

In the present case, the plaintiffs contend that Amtrak failed to establish a procedure for what locomotive engineers should do if and when they see an obstruction on the tracks ahead of them, and failed to train its engineers in the appropriate procedures for that situation. As noted earlier, the parties appear to agree that such requirements exist, if at all, only by virtue of state common law. The regulations cited by Amtrak as preemptive of state law are Parts 217, 218, and 240 of Title 49 of the Code of Federal Regulations. Part 217 requires railroads to establish operating rules and file them with the FRA, as well as to instruct its employees on those rules and test them for compliance; however, it does not prescribe any particular operating rules. Part 218 includes certain "minimum requirements" for railroad operating rules, while permitting railroads to adopt additional or more stringent requirements. 49 C.F.R. § 218.1. The minimum requirements established by Part 218 include rules for the protection of railroad employees engaged in the inspection, testing, repair, and servicing of the railroad's rolling equipment, *see* 49 C.F.R. § 218.21; requirements for the protection of employees operating rolling equipment, *see id.* § 218.31; prohibitions against tampering with safety devices on trains, *see id.* § 218.51; and requirements for the protection of "camp cars" that house railroad employees, *see id.* 218.71. Part 218 does not indicate, however, any attempt to regulate or promulgate standards for the manner in which locomotives are operated while in service.

Finally, Part 240 establishes requirements for the qualification and certification of locomotive engineers. These include a requirement that a railroad have a certification program

6

for locomotive engineers that complies with the requirements of "Appendix B" to Part 240 – which we will discuss in more detail shortly – and that includes specifics regarding how a person's prior conduct as a motor vehicle driver, failures to comply with railroad rules, and history of substance abuse should be considered; criteria for vision and hearing acuity; requirements for continuing education; and a requirement that a railroad have various procedures for examining and monitoring an engineer's performance skills and application of the railroad's rules for safe operation. Railroads are also required to provide for continuing education "to ensure that each engineer maintains the necessary knowledge, skill and ability concerning personal safety, operating rules and practices, mechanical condition of equipment, methods of safe train handling ..., and relevant Federal safety rules." 49 C.F.R. § 240.123(b).

Appendix B to Part 240 establishes the procedures for FRA approval of a railroad's program to train, test, and evaluate persons seeking certification or recertification as locomotive engineers. It requires the railroad's submission to be organized in seven separate sections. The first section is to include basic information about the railroad and a statement as to whether it has accepted responsibility for educating previously untrained persons to qualify, or instead will recertify only those previously certified by other railroads. Section two of the railroad's submission is to include information regarding its procedures for selecting persons to evaluate engineer certification candidates. The railroad has "latitude to select the criteria and evaluation methodology" for supervisory personnel but is required to describe to the FRA how it intends to use that latitude. App. B, § 2. The third section of the railroad's submission to the FRA is to contain information concerning the railroad's program for training previously certified engineers. Again, the railroad has "latitude to select the specific subject matter to be covered" and the like,

7

but it must describe to the FRA how it intends to use that latitude "to assure that its engineers remain knowledgeable concerning the safe discharge of their train operation responsibilities" so as to comply with the above-described performance standard set forth in § 240.123(b). *Id.,* § 3. The fourth section of the railroad's submission to the FRA is to cover the railroad's program for testing and evaluating previously certified engineers. This portion of Appendix B includes a similar statement regarding the "latitude" given to railroads but also provides that the railroad's evaluation procedures must examine a person's skills in applying the railroad's rules and practices for safe operation in the areas of operating and inspecting equipment, train handling, and compliance with federal safety rules. *Id.,* § 4. The fifth section of the railroad's submission is to cover its procedures for conducting initial training of persons not previously certified; this section, too, includes a similar statement regarding the "latitude" given to the railroad. Section six of the submission to the FRA is to include information about the railroad's program for monitoring certified engineers, and section seven is to provide a summary of how the railroad's program will implement regulations concerning routine administration of its certification program. *Id.,* §§ 5-6.

The concluding section of Appendix B relates that the FRA had "initially proposed specifying the details for most aspects of the programs being submitted," including "a distillation of the essential elements of pre-existing training, testing, evaluating, and monitoring programs" and "very specific details for each aspect of the program." But after receiving adverse comments from railroads, the FRA was persuaded to "give[ ] railroads discretion to select the design of their individual programs within a specified context for each element." *Id.,* § "FRA Review." The FRA's review of a particular railroad's submission is thus "focused on determining the validity

8

of the reasoning relied on by a railroad for selecting its alternative approach and the degree to which the alternative approach is likely to be effective in producing locomotive engineers who have the knowledge, skill, and ability to safely operate trains." *Id.*

Having reviewed the federal regulations identified by Amtrak, we turn to the question of whether they preempt state standards. The Court rejects Amtrak's preemption argument to the extent that Amtrak contends federal regulations preempt the imposition of state standards for safe operation of locomotives. There is no indication that the FRA has made any effort to regulate standards for how engineers are to operate locomotives over the road. The fact that the agency requires railroads to have such procedures does not amount to the adoption of a regulation covering the subject matter of operating procedures, the predicate for preemption under § 434(a) and *Easterwood.* Federal regulations do not "substantially subsume" this subject, as required under *Easterwood* for preemption to occur.

The Court reaches a different conclusion, however, regarding the issue of training. The FRA's regulations contain detailed and particularized requirements that railroads must meet regarding the overall structure of their training programs. Though the FRA eschewed the approach of imposing particularized training requirements, it is apparent from Appendix B to Part 240 that the agency did so only after making a regulatory determination to leave the specifics to the individual railroads. In other words, the FRA made a considered decision that the law should not prescribe specifics in this area. To put it in the terms of *Doyle,* the agency "considered [the] subject matter and made a decision regarding it."

For these reasons, the Court agrees with Amtrak that federal law preempts state law regarding training of locomotive engineers, but holds that federal law does not preempt state law

9

regarding the imposition of safe operating procedures. In other words, plaintiffs may pursue a claim at trial based on the proposition that Amtrak was negligent in its alleged failure to have standards regarding safe operation of a locomotive when there is an obstruction on the tracks ahead. The distinction between having procedures and training engineers in those procedures is arguably a subtle one, but the Court believes that this is the distinction required by the principles of federal preemption under § 434(a) and *Easterwood*.

### 3. Use of "expert" label at trial

The Court will not preclude the parties from referring to witnesses as "experts" when such reference is supported by the evidence; this is fair argument that is properly within the latitude ordinarily given to counsel. The Court will not, however, put its own imprimatur on any such designation in the jury's presence. Thus, as is this Court's usual practice, our instructions to the jury concerning the consideration of opinion testimony will not include the "expert" label but rather will refer to persons with specialized knowledge or skill. In addition, during or after questioning of a party's opinion witnesses, counsel are not to request the Court to "qualify" the person as an "expert" and are not to ask the Court to allow the witness to give "expert" testimony. Rather, when counsel is finished with direct examination of the witness on his or her qualifications, counsel should simply tender the witness for examination on qualifications, and the Court will inquire of opposing counsel whether they wish to examine the witness at that point or defer examination until cross. If opposing counsel do not believe that the witness has been qualified to give an opinion under Rule 702, the appropriate means to bring that to the Court's attention is to object when such testimony is elicited, stating that the witness has not been properly qualified to give opinion testimony.

10

**B.     Plaintiffs' motions**

**1.     Evidence of NTSB's findings and conclusions**

The Court grants the plaintiffs' request to bar reference to the opinions, findings, and conclusions reached by the National Transportation Safety Board in its investigation regarding the collision.  Such evidence is unequivocally barred by federal statute and regulation.  Under 29 U.S.C. § 1154(b), "[n]o part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report."  Regulations promulgated by the NTSB establish that although its employees may testify regarding factual information they obtained during the course of an investigation, including factual evaluations, they may not testify about their conclusions or opinions.  *See* 49 C.F.R. § 835.3(c), (e).  Based on these regulations, "[c]ourts have consistently held that 'the factual portions of a NTSB report are admissible into evidence, while excluding any agency conclusions on the probable cause of the accident.'"  *Major v. CSX Transportation,* 278 F. Supp. 2d 597, 603-04 (D. Md. 2003) (quoting *Hurd v. United States,* 134 F. Supp. 2d 745, 750 (D.S.C.2001), *aff'd,* 34 Fed. Appx. 77 (4th Cir. 2002), and citing *Travelers Ins. Co. v. Riggs,* 671 F.2d 810, 816 (4th Cir. 1982)).  *See also Barna v. United States,* 183 F.R.D. 235, 237 (N.D. Ill. 1998) (barring reference by any party, witness, or attorney to conclusions contained in NTSB report).  Amtrak contends that it should be able to cross examine the plaintiffs' expert witnesses with the NTSB's report and conclusions because they reviewed it; Amtrak claims the plaintiffs' experts have reached conclusions contrary to those made by the NTSB.  At oral argument, however, Amtrak's counsel conceded that he could cite no case supporting his argument that the law permits such use of an NTSB report.  Acceptance of Amtrak's position would allow it to

11

bring in through the back door what it is precluded from bringing in through the front, and it would effectively abrogate § 1154(b). The Court does not believe that the plaintiffs have waived § 1154(b) by having their experts review the NTSB report. Plaintiffs' motion is therefore granted.

### 2. Reference to Stokes' claim of Fifth Amendment privilege

In the days following the crash, John Stokes, the driver of the truck that collided with the train, made statements to investigators regarding the hours he had worked prior to the crash. Evidence was then obtained that indicated these statements might be false and that Stokes may have violated limitations set by federal regulation regarding the hours that may be worked by over-the-road truck drivers. In August 2000, in a deposition taken in a separate lawsuit concerning the Bourbonnais crash, John Stokes claimed his privilege against self-incrimination when asked about his activities on the day of the collision.

Plaintiffs seek to preclude Amtrak from introducing Stokes' self-incrimination claim at trial in the present case. It is beyond question that the Constitution permits an adverse inference to be drawn against a party in a civil action who claims the privilege against self-incrimination. *Baxter v. Palmagiano,* 425 U.S. 308 (1976). But the inference is permissive, not mandatory, *see e.g., Daniels v. Pipefitters' Ass'n Local Union No. 597,* 983 F.2d 800, 802 (7th Cir. 1993), and plaintiffs contend that under the circumstances, admitting Stokes' privilege claim from a separate case would unfairly prejudice them while contributing only marginal, if any, probative value. At oral argument, the Court determined that neither Amtrak nor any other party sought to depose Stokes in the present case (which was filed some time after the August 2000 deposition), and thus we do not know whether he would have claimed the privilege if he had been called for

12

deposition in this case. Under the circumstances, the Court believes that probative value of

Stokes' privilege claim in a separate lawsuit has only limited probative value. *See, e.g., Harris v.*

*City of Chicago,* 266 F.3d 750, 753-54 (7th Cir. 2001) (witness's invocation of Fifth Amendment

is of "extremely low" probative value if witness later waived privilege and parties "had sufficient

opportunity to obtain discovery from [the witness] on all issues related to the trial.").

The parties have indicated that Stokes is a likely witness at trial, and thus the Court will

make the final determination if and when he appears as to whether his privilege claim in the other

lawsuit will be admitted (if Stokes is not called to testify, the earlier claim of privilege likely will

not be admitted).

### 3.    Evidence regarding criminal charge against Stokes

Amtrak does not oppose plaintiffs' request to preclude evidence that Stokes is or was the

subject of a criminal charge regarding the maintenance of his log book concerning his activities

on the day of the crash, but it contends it should be permitted to offer evidence that failure to

keep an accurate log violates federal law. The Court agrees.

### 4.    Inclusion of settling parties on verdict form

Under Illinois law, a defendant is only severally (not jointly) liable for damages other

than the plaintiff's medical expenses if its level of fault "is less than 25% of the total fault

attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant

who could have been sued by the plaintiff." 735 ILCS 2-1117.[1] Third party defendants Melco

and Stokes have filed a motion seeking a finding that they have settled in good faith with the

---

[1] This statute's predecessor, enacted in 1986, altered Illinois' common law rule of joint
and several liability.

13

plaintiffs and thus are not liable for contribution. *See* 740 ILCS 100/2(d). If the Court makes the requested finding, Amtrak's liability, if any, will be reduced by the amount of the settlement payment those parties have made to the plaintiffs. *Id.* § 2(d). Amtrak seeks, however, a ruling that any parties that have settled nonetheless will be included on the verdict form so that the jury can determine their relative fault. It argues that inclusion of all persons potentially responsible for the plaintiff's injury, whether or not they are defendants at the time of trial, is the only way to effectuate the Illinois legislature's intent in adopting section 2-1117.

The Seventh Circuit, interpreting Illinois law, has rejected this argument as to the pre-1995 version of section 2-1117 (which is does not differ significantly from the current version). *See Freislinger v. Emro Propane Co.,* 99 F.3d 1412, 1419 (7th Cir. 1996). The court held that the terms "defendants" and "third party defendants" in section 2-1117 "means only those defendants who remain in the case when it is submitted to the fact finder." *Id.* (citing *Lannom v. Kosco,* 158 Ill. 2d 535, 543, 634 N.E.2d 1097, 1101 (1994), and *Blake v. Hy Ho Restaurant, Inc.,* 273 Ill. App. 3d 372, 376, 652 N.E.2d 807, 811 (1995)).

Amtrak, noting that the Seventh Circuit does not have the final word on what Illinois law provides, argues that *Freislinger* was wrongly decided. Indeed, another judge in this District so held and chose not to follow *Freislinger. See Costello v. United States,* No. 96 C 187, 1998 WL 341615, at *2-3 (N.D. Ill. June 23, 1998). Even though an appeal in this case will go to the same court that decided *Freislinger,* it is conceivable that by the time an appeal is determined, the Illinois Supreme Court will have spoken directly on the issue. And as Amtrak points out, the Seventh Circuit is not necessarily infallible in predicting the development of Illinois tort law. *Compare Unzicker v. Kraft Food Ingredients Corp.,* 203 Ill. 2d 64, 77-78, 783 N.E.2d 1024,

1033 (2002) *with Jansen v. Aaron Process Equipment Co.*, 149 F.3d 603, 606-09 (7th Cir. 1998) (a pre-*Unzicker* decision holding, contrary to the later *Unzicker* decision, that the plaintiff's employer, a third party defendant in a personal injury case, was *not* a third party defendant who "could have been sued by the plaintiff" and thus could not be considered under section 2-1117 in determining the defendant's relative fault).

*Freislinger* relied on two Illinois decisions, the Supreme Court's *Lannom* decision and the decision by the Fifth District of the Illinois Appellate Court in *Blake*. *Blake* squarely holds that settling defendants are not to be included in the assessment of relative responsibility under section 2-1117, but the real question is what the Illinois Supreme Court would determine, not what an intermediate appellate court has held. *Cf. Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002) (holding that in an action that is in federal court by virtue of diversity jurisdiction, the federal court must determine how the state supreme court would interpret state law and is not bound by the rulings of intermediate appellate courts). On the other hand, federal courts "ought to give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court." *Id.*

There is in fact reason to believe that the Illinois Supreme Court would decide the matter differently from *Blake* and that the Seventh Circuit misread *Lannom* when it decided *Freislinger*. *Lannom* was a suit by a county employee who was working alongside a highway when he was struck by a car. He sued the car's driver, and the driver filed a contribution claim against the county, alleging that it engaged in willful and wanton misconduct in parking a county vehicle on

15

the wrong side of the road without warning devices. After an Illinois Supreme Court decision

holding that an employer's liability in contribution is limited to the amount of its worker's

compensation liability, the trial court dismissed the driver's contribution claim against the

employer. The driver argued that dismissal of the claim was improper because it would "obstruct

the purpose of section 2-1117" by precluding the jury from apportioning any fault to the county

and denying the driver the ability to obtain an apportionment of 25% or less. The Illinois

Supreme Court declined to overturn the dismissal of the claim, stating as follows:

> We note, however, that this dilemma arises whenever a defendant or third
> party settles with the plaintiff or is dismissed from an action for any reason.
> Section 2-1117 was not intended to prohibit the dismissal of a defendant or third
> party from an action, where such dismissal is otherwise warranted. Moreover, the
> defendant's rights under section 2-1117 are not abolished simply because a
> defendant or third party settles or it dismissed from an action. The jury may still
> assess the remaining defendants' relative culpability, and if the degree of fault
> attributable to one or more defendants is less than 25%, those defendants' liability
> is several only. *See Alvarez v. Fred Hintze Construction* (1993), 247 Ill. App. 3d
> 811, 187 Ill. Dec. 364, 617 N.E.2d 821; Walsh & Doherty, *Section 2-1117,
> Several Liability's Effect on Settlement and Contribution,* 79 Ill. B.J. 122, 125
> (1991).

*Lannom,* 158 Ill. 2d at 542-43, 634 N.E.2d at 1101.

As indicated earlier, *Freislinger* cited this passage for the proposition that the term

"defendants sued by the plaintiff" in section 2-1117 "means only those defendants who remain in

the case when it is submitted to the fact finder." *Freislinger,* 99 F.3d at 1419. But no such

statement appears in *Lannom.* Judge Kocoras disagreed with *Freislinger* in *Costello,* looking at

the authorities on which *Lannom* relied and concluding that the Supreme Court had intended to

indicate that the culpability of the "remaining defendants" is to be assessed against that of the

settling defendants. And that is indeed what *Alvarez,* the case cited by the Supreme Court as

authority in *Lannom*, seems to say. *Alvarez* involved essentially the same legal issue as *Lannom*. Presaging the Supreme Court's decision in *Lannom*, the Third District of the Illinois Appellate Court upheld the dismissal of an alleged tortfeasor's contribution claim against the plaintiff's employer following approval of the plaintiff's settlement of his worker's compensation claim against his employer. In rejecting the defendant's argument that dismissal of the contribution claim would effectively abrogate its rights under section 2-1117, the court stated that dismissal "does not necessarily deny a nonsettling defendant the potential benefit by section 2-1117," quoting the Walsh / Doherty article's comment that even after one tortfeasor's settlement, "'[t]he jury should still be able to assess the defendant's relative culpability, and if the defendant's level of fault falls below the 25 percent threshold, its liability is several only and is not affected by the plaintiff's settlement with the other tortfeasor.'" *Alvarez*, 247 Ill. App. 3d 818, 617 N.E.2d at 826 (quoting Walsh & Doherty, *supra*, 79 Ill. B.J. at 125). We note that Supreme Court's language in *Lannom* that we quoted above is virtually a verbatim quote of this same language from the Walsh / Doherty article.

From this analysis the Court concludes that *Lannom*, far from determining that settling defendants and third party defendants are to be eliminated from the section 2-1117 calculus, indicates that they may included despite their settlement. This result is consistent with the language of the statute. Settling defendants and third party defendants are among the "defendants sued by the plaintiff" and, in this case at least, are among the "third party defendant[s] who could have been sued by the plaintiff. The real question is the time at which whether a party is or was a "defendant" is to be determined. *Freislinger* and *Blake* says that the determination depends on who remains in the case when it is submitted to the fact finder; *Lannom* and *Alvarez* indicate that

17

the answer depends only on whether a party was a defendant or third party defendant at some point during the case. Though both approaches give meaning to the statute's language, the latter approach is more faithful to the Illinois Supreme Court's statement that "[t]he clear legislative intent behind section 2-1117 is that minimally responsible defendants should not have to pay entire damage awards." *Unzicker,* 203 Ill. 2d at 77-78, 783 N.E.2d at 1033. Though this Court does not lightly contradict a superior court's construction of Illinois law, we conclude that *Freislinger* does not correctly interpret section 2-1117 and hold that settling defendants and third party defendants who could have been sued by the plaintiffs will be included in the jury's assessment of percentage fault.[2] Plaintiffs' motion *in limine* to keep settling parties off the verdict form is therefore denied.

### 5.     Inclusion of Illinois Central on verdict form

Plaintiffs also ask the Court to preclude putting Illinois Central Railroad Company on the verdict form, as well as any argument to the effect that Illinois Central has any responsibility for the plaintiffs' injuries. Illinois Central, a third party defendant, owns the section of railroad tracks and the signal system that spans the area where the collision took place. Amtrak did not add Illinois Central as a third party defendant until after this Court rejected its motion to dismiss the plaintiffs' claims on the grounds that the plaintiffs had not joined as defendants Illinois

---

[2] Contrary to the concerns of the court in *Blake,* this does not require keeping the settling defendants in the case, either as actual parties (which would contravene *Lannom* in any event) or even as nominal parties. Keeping the settling party in the case is not necessary to obtain the testimony of that party's personnel; contrary to the *Blake* court's suggestion, a settlement does not inevitably keep a party's witnesses out of a trial. The dismissal of any settling defendants will leave the plaintiffs and the remaining defendants and third party defendants (in the present case at least) completely unhindered in presenting evidence and arguments regarding the relative responsibility of all concerned.

Central, as well as Melco, Stokes, and Birmingham Steel.[3] Illinois Central has not answered the third party complaint. This is presumably because it is represented in this and related litigation by the same counsel who represent Amtrak, evidently as a result of an agreement under which Amtrak is indemnifying Illinois Central for any liability in this case.

These events have led the plaintiffs to cry foul; they argue that "Amtrak is attempting to abuse the procedural safeguard and remedies that are available to parties in a proceeding, in an attempt to merely shift blame to a 'ghost' party whose interests and the interests of Amtrak are the same." Plaintiffs' May 3, 2004 Pre-Trial Motions *In Limine*, p. 14. But it is premature to make such a determination. Unless evidence is presented at the trial from which the jury reasonably could find Illinois Central partly at fault, it will not be included on the verdict form. The plaintiffs will have the right to seek a ruling on this point at an appropriate point juncture under Federal Rule of Civil Procedure 50(a). Plaintiffs do not suggest that they or anyone else lacks the information or evidence necessary to make an intelligent presentation regarding the responsibility of Illinois Central, and thus there is no reason to make a preemptive ruling barring evidence or argument regarding that entity's role.

## C.    Birmingham Steel's motions

### 1.    Testimony regarding agency or employment

The Court previously granted third party defendant Birmingham Steel's motion for summary judgment as to claims premised on a theory that either John Stokes, the driver of the

---

[3] Contrary to the contention of Amtrak's counsel at oral argument, the Court did not encourage or invite Amtrak to name Illinois Central as a third party defendant but merely authorized it to do so. *See Dowe v. Nat'l RR Passenger Corp.*, No. 01 C 5808, 2003 WL 22383016, at *5 (noting that "Amtrak has elected which parties to sue for contribution"), 7 (authorizing Amtrak to file a third party claim against Illinois Central).

truck with which the Amtrak train collided, or Melco Transfer, Inc., the truck's owner, was

Birmingham's agent. *See Wilson-McCray v. Stokes,* Nos. 01 C 1929 & 01 C 5808, 2003 WL

22901569 (N.D. Ill. Dec. 9, 2003). For this reason, the Court grants Birmingham's request to bar

any argument at trial that Melco or Stokes was its agent or employee. The Court also agrees with

Birmingham's request to preclude testimony that it regarded Melco as its "house truck." Though

Amtrak suggests that such testimony is somehow relevant to its claims that Birmingham was

directly liable, it has made no effort to explain how this is so. As far as the Court can tell, such

evidence is not relevant to any theory of liability other than the rejected agency theory, and thus it

will be excluded at trial.

### 2. Evidence regarding oversized or illegal loads or inherent dangers

As indicated in the Court's ruling on Birmingham's summary judgment motion, the

motion was directed only to claims against Birmingham premised upon the theory that Melco and

Stokes were Birmingham's agent. All other theories of liability fairly encompassed by the

contribution claims remain for trial. *Wilson-McCray,* 2003 WL 22901569, at *2, 6. Under the

guise of a motion *in limine,* Birmingham seeks to eliminate those claims by requesting an order

barring any evidence or argument that when it left Birmingham's facility, the truck and its load

were overlength, oversized, and/or dangerous. The Court rejects this request; the time for

seeking summary judgment has long passed.

### 3. Request to preclude theories other than negligent entrustment

The Court also rejects Birmingham's request to bar litigation of any theories of its

liability other than that of negligent entrustment. As indicated in the Court's summary judgment

ruling, Amtrak's claim against Birmingham also appears to encompass the theory that

20

Birmingham is liable for the reasons described in section 427 of the Restatement (Second) of Torts, which is followed in Illinois, specifically for employing an independent contractor to do work involving an inherent danger. As Amtrak indicates in its reply, its claim against Birmingham is asserted in a way that likewise will permit it to assert Birmingham's liability under section 416 of the Restatement, to which section 427 is "closely related." *See* Restatement (Second) of Torts § 427, comment a (1965).[4]

### 4. Evidence regarding NTSB's findings and conclusions

This motion is granted for the reasons stated in Section B.1 above.

### 5. Evidence the Burmingham contributed to or caused secondary collision

In its fifth motion, Birmingham seeks to preclude evidence that the presence of rail cars on side tracks adjacent to Birmingham's facility caused or contributed to the plaintiffs' injuries. Amtrak has not objected to this request. The request is granted.

### 6 & 7. Argument regarding personal opinions as to witness credibility and argument about "sending a message"

Birmingham's requests to bar argument regarding counsel's personal opinions of witnesses' credibility and argument about "sending a message" are granted without objection.

---

[4] Amtrak's response to this motion suggests it believes that it has free rein to amend its complaint at will up to the time of trial and during trial to assert additional claims or theories. Not so; though a party's right to amend a pleading is to be "freely given," Fed. R. Civ. P. 15(a), this is subject to reasonable limitations. *See generally Foman v. Davis,* 371 U.S. 178, 182 (1962) (leave to amend may be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."). A party is not required to plead a legal theory under federal pleading rules, *see, e.g., McCullah v. Gadert,* 344 F.3d 655, 659 (7th Cir. 2003), but a court still must determine whether a pleading gives the opposing party fair notice of the pleader's claims. *Swierkiewicz v. Sorema S.A.,* 534 U.S. 506, 512 (2002); *Conley v. Gibson,* 355 U.S. 41, 47 (1957).

**8.    Evidence that improper maintenance of driver's log book violates the law**

The Court denies Birmingham's request to bar evidence that making improper entries in a truck driver's log book violates federal law; this evidence is relevant to Amtrak's attempt to attribute liability to Melco and Stokes.

**9.    Lay testimony as to medical conditions**

The Court grants Birmingham's request to bar lay opinions regarding the nature and extent of injuries suffered by the plaintiffs, but this does not preclude testimony by injured persons regarding what they have experienced or testimony by family members or others regarding their personal observations of the injured persons.

### Conclusion

For the reasons stated above, Amtrak's motion *in limine* [docket # 92-1] is granted in part and denied in part as to requests 1, 2, and 3; plaintiffs' May 3, 2004 pretrial motion *in limine* [# 95-1] is granted as to request 1, deferred as to requests 2 and 5, granted in part and denied in part as to request 3, and denied as to request 4; and Birmingham Steel's motion *in limine* is granted as to requests 1, 4, 5, 6, 7, granted in part as to request 9, and denied as to requests 2, 3, and 8.  The case is held for trial on May 3, 2004 at 9:45 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:    April 26, 2004

22